**In the Matter of Nicholas and Venus PASTIS, Debtor.**

**Bankruptcy No. 82–2064.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 24, 1984.

Albert Lima, Tampa, Fla., for debtor.

## ORDER ON OBJECTION TO CLAIM

ALEXANDER L. PASKAY, Chief Judge.

THIS CAUSE came on for hearing upon an Objection to Claim of the National Collection Agency, Inc. filed by Nicholas and Venus Pastis, the Debtors in the above-styled Chapter 11 case. National filed its claim in the amount of $32,830 for monies due and owing pursuant to an equipment lease entered into between Equico Lessors and the Debtors which was later assigned to National by Equico. The Debtor objects to the claim on the grounds that the claim for damages by National is excessive and that the sale of the equipment was not conducted in a commercially reasonable manner.

The facts pertinent to a resolution of this matter as adduced at a final evidentiary hearing are as follows:

On August 24, 1978, William Pastis as Vice President of Hillsborough Fish & Chips, Inc. (Fish & Chips) leased from Equico certain restaurant equipment including such items as an ice drink machine, deep fryers, refrigerator and furniture color coded for Arthur Treacher's stores. On the same day, Mr. Pastis executed a personal guaranty agreement whereby he personally guaranteed the 60 monthly rental payments of $841.63.

Fish & Chips remained current on its lease payments through March of 1981 and Equico had received a total of 33 payments. However, Fish & Chips failed to make the April, 1981 payment and the May, 1981 payment became due when the restaurant ceased operating on May 13, 1981. Shortly thereafter the Debtors caused the equipment to be removed from the premises and on May 19, 1981, they notified Equico that the equipment was being stored at a U-Store storage facility. Although the record is unclear when Equico responded to the Debtor's notice, it is apparent that Equico made no efforts to contact the Debtors until after the Debtors surrendered the equipment in July to a recovery service hired by Equico to recover the equipment and after recovery, to liquidate same. Between the time the Debtors removed the equipment and notified Equico and the time the equipment was turned over to the Recovery Service, the Debtors incurred storage and removal costs in the amount of $260.

After receiving the equipment, the Recovery Service contacted prospective pur-

chasers; mailed notices of the proposed sale to approximately forty restaurant equipment retailers in the area. In September of 1981, the Recovery Service conducted an auction at the U-Store lot and charged a fixed fee of $661.98 for handling the sale. The recovery service received five bids and was instructed by Equico to accept the highest bid for the entire package of equipment in the amount of $961.54.

The Debtors take the position that Equico is entitled to recover only the rent payments which were in default at the time the Debtors notified Equico that the restaurant had terminated the lease. In support of their position, the Debtors rely on *Monsalvatge & Co. of Miami, Inc. v. Ryder Leasing, Inc.*, 151 So.2d 453 (3rd DCA Fla. 1963); *Cutler Gate Bldg. Corp. v. United States Leasing Corp.*, 165 So.2d 207 (Fla. 3rd DCA 1964).

These Courts hold that when a leasee defaults on his lease, the lessor may not recover both the amounts of the unpaid balance on the lease and have the beneficial use of the property for the remaining term of the lease. Such a result would give the lessor a windfall as the lessor would be entitled to a double recovery in the amount of a default. *Monsalvatge*, at 455.

Subsequent cases have not interpreted the *Monsalvtge* and *Cutler Gate* decisions as establishing a per se rule that only payments in default can be recovered regardless of the contractual damages provision agreed upon by the parties. *Chandler Leasing Division, Pepsico Service Inds. Leasing Corp. v. Florida-Vanderbilt Devel. Corp.*, 464 F.2d 267 (5th Cir.1972); *Bidwell v. Carstens*, 316 So.2d 264 (Fla.1975). In *Chandler*, the Fifth Circuit reasoned that such an absolute rule would allow the leasee to breach a lease with impunity being subject only to payments in default while the lessor would never know when and in what condition the property would be returned. *Chandler*, at 270.

The courts in *Chandler* and *Bidwell* then examined whether the contract clause provides for damages in the event of default in order to determine whether the lease pro-

vided an opportunity for double recovery. In *Chandler*, the Fifth Circuit determined that the default provisions in the lease did not provide for a windfall since the lessor was required to either sell or relet the chattel and credit the leasee with the proceeds received.

In *Bidwell*, the leasee appealed the trial court's decision that the leasee was liable for lease payments for the entire lease term even though the lessor retained the beneficial possession of the vehicle for approximately one year after the default. The District Court of Appeals affirmed the decision, but was overruled by the Florida Supreme Court which found that the lease permitted a windfall and directed that the leasee be given credit for the year that the lessor retained possession of the vehicle.

██ Under the Florida law there are three remedies available to a lessor on breach of the lease agreement which are (1) terminate the lease and resume possession for the lessor's own use; (2) retake possession for account of the tenant and then hold the tenant in general damages for the difference between the rentals stipulated and amount recoverable from good faith releting; or (3) stand by and sue the leasee as each installment of rent falls due or for the whole amount when it becomes due. *Chandler*, at 271.

Although these remedies are ordinarily applicable in landlord-tenant relationships, courts have recognized the remedies in cases involving the lease of personal property. *Chandler*, at p. 271; *BVA Credit Corp. v. Fisher*, 369 So.2d 606, 609 (1st DCA Fla.1978). These remedies are intended to supply remedies when none are provided in the lease or when the contractual remedy violates public policy. *Chandler* at 271.

Regardless of whether the default provision of the lease in the case at bar permits the opportunity of a double recovery it is clear that Equico's actions fell within the second category of available remedies. There is no evidence that Equico used the equipment or retained possession for its

own benefits. Rather the equipment remained at the U-Store lot where the Debtors had stored it until the equipment could be sold in September.

▪ As noted earlier, the equipment sold at the auction consisted of items used in an Arthur Treacher's restaurant. However, the equipment was not so specialized that it could not be used in other restaurants. As a result, the fact that the recovery service did not specifically notify other Arthur Treacher restaurants of the sale did not render the sale commercially unreasonable.

▪ In light of the foregoing, the Court is satisfied that the claim of the National Collection Agency shall be allowed in the amount equal to the 25 monthly rental payments of $841.63 remaining unpaid on the lease plus the two rent payments of $841.63 each which are in arrears reduced by the $961.54 received at the sale and $120 for storage expenses incurred by the Debtor prior to the sale. This sum of $21,642.47 shall be further reduced by 15% for present value for a final total of $18,396.10.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Claim filed by the Debtors, Nicholas and Venus Pastis, be, and the same hereby is, overruled. It is further

ORDERED, ADJUDGED AND DECREED that the claim of National Collection Agency, Inc. be, and the same hereby is, allowed in the amount of $18,396.10.